## J. R. GLONINGER v. PITTSB. & C. R. CO.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
NO. 1 OF ALLEGHENY COUNTY.

Argued October 27, 1890—Decided January 5, 1891.
[To be reported.]

1. If a railroad, authorized expressly by its charter to mortgage its railroad and other property, but without express authority to mortgage its corporate franchises, make a mortgage covering both its railroad and franchises, the validity of the mortgage, as to the railroad, is unaffected by the inclusion of the corporate franchises therein, even if unauthorized.

2. The power to borrow money, and to give the ordinary evidences of loans in the form of bonds or other obligations to the same effect, is a necessary incident to the power of the corporation to mortgage its property, and need not be expressly granted; moreover, it is a necessary incident of the power to build a railroad: Pittsb. etc. R. Co. v. Allegheny Co., 63 Pa. 126.

(a) A supplement to an act incorporating a railroad company authorized the company to mortgage its road, and any real or personal property belonging to it, " for the purpose of carrying out the privileges granted by the act and the several supplements thereto incorporating the same."

Statement of Facts.

Said supplements, and later ones, authorized various extensions of the railroad:

3. The power to mortgage extended to future extensions of the railroad subsequently authorized, and all other real and personal estate of the company, without regard to the time of acquisition; it was not exhausted when the railroad, as authorized at the date of the supplement, was completed, but justified a mortgage to carry out any power then or afterward granted to the company.

4. The provisions of § 7, article XVI. of the constitution, and the act of April 18, 1874, P. L. 61, regulating the manner in which the stock and indebtedness of corporations may be increased, do not apply to a corporation which was invested by its charter, before the constitution was adopted, with unrestricted power to make such increase, and accepted the benefit of no legislation since 1874.

5. And this, though the corporation, by accepting legislation in 1868, subjected itself to the act of May 3, 1855, P. L. 423, and the constitutional amendment of 1857: Williamsport Ry. Co.'s App., 120 Pa. 1; Hays v. Commonwealth, 82 Pa. 523; Ahl v. Rhoads, 84 Pa. 319; Lewis v. Jeffries, 86 Pa. 340, followed; Penna. R. Co. v. Duncan, 111 Pa. 352; Lewis v. Hollahan, 103 Pa. 425; Penna. R. Co. v. Bowers, 124 Pa. 183, distinguished.

6. Minority stockholders of a corporation cannot complain of an issue of mortgage bonds to a holder of the majority of the stock, when such issue was made by the corporation without fraud, for an adequate consideration, and with great benefit to the corporation, though the issuance was procured by the majority stockholder for use to raise money for himself, and was actually so used.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, MC-COLLUM and MITCHELL, JJ.

No. 214 October Term 1889, Sup. Ct.; court below, No. 477 March Term 1886, C. P. No. 1, in Equity.

On February 3, 1886, John R. Gloninger, administrator of the estate of Sarah B. Fetterman, deceased, and executor of the will of G. L. B. Fetterman, deceased, and Ada K. Chain, filed a bill in equity, on behalf of themselves as stockholders in the Pittsburgh & Connellsville Railroad Company, and on behalf of any other stockholders therein who might intervene as plaintiffs, against said Pittsburgh & Connellsville Railroad Company, the Baltimore & Ohio Railroad Company, the Union Trust Company of New York, and Robert Garrett, president, and Mendes Cohen and others, directors of the Pittsburgh & Connellsville Railroad Company. The bill prayed, inter alia, that certain bonds to the amount of $10,000,000 issued by the

Statement of Facts.

Pittsburgh & Connellsville Railroad Company to the Baltimore & Ohio Railroad Company, and by the latter pledged to the Union Trust Company of New York, as security for a debt of its own, and also a certain mortgage of the railroad and franchises of the Pittsburgh & Connellsville Railroad Company, given as security for the payment of said bonds, should be declared null and void and decreed to be delivered up for cancellation.

Issue having been joined, the court appointed *Mr. Robert B. Carnahan*, examiner and master, by whom the following, among other facts, were found :

The Pittsburgh & Connellsville Railroad Company was incorporated by act of April 3, 1837, P. L. 185, to construct and operate a railroad from the city of Pittsburgh to Connellsville, in Fayette county.   By subsequent legislation in the states of Pennsylvania and Maryland, it was empowered to extend its road to Cumberland, Md.   The entire line from Pittsburgh to Cumberland was opened for business in 1871, and at the Cumberland terminus it connected with the main line of the Baltimore & Ohio railroad.

Prior to 1870, the Baltimore & Ohio Railroad Company became the holder of a majority of the shares of the capital stock of the Pittsburgh & Connellsville Railroad Company, and has ever since held the same.   In 1875, the Pittsburgh & Connellsville Railroad Company leased its railroad to the Baltimore & Ohio Railroad Company for the term of fifty years from January 1, 1876, with a stipulation for a perpetual renewal of the lease, from year to year, at the option of the lessee.   The lease provided that the lessee should furnish the necessary rolling stock and equipment for the operation of the railroad, and should receive, out of the revenues of the road, a reasonable compensation for the use of such rolling stock and equipment. Since 1876 said railroad has been operated under that lease by the Baltimore & Ohio Railroad Company.

The mortgage in controversy was made in February, 1885. The bonds secured thereby were of the denomination of $100,000 each, and aggregated $10,000,000, bearing interest at the rate of five per cent, and to mature in forty years.   They were taken by the Baltimore & Ohio Railroad at ninety per cent of their face value, the consideration for which they were issued being made up as follows:

| | |
|---|---:|
| Debt of the Pittsburgh & Connellsville Railroad Company to the Baltimore & Ohio Railroad Company, the greater part of which was represented by a judgment recovered in the Circuit Court of the United States, | $4,688,282.67 |
| Rolling stock sold by latter company to former, | 1,212,500.00 |
| Stocks and bonds issued by various corporations owning railroads connecting with and forming feeders of the Pittsburgh & Connellsville railroad, sold by the B. & O. R. Co. to the P. & C. R. Co., | 2,803,239.63 |
| Cash, | 295,977.70 |
| Total, | $9,000,000.00 |

The issue of these bonds and the making of the mortgage to secure them, were authorized by the unanimous vote of the stock represented at a stockholders' meeting held January 30, 1885. Of this meeting, sixty days notice had not been given, in accordance with § 7, article XVI. of the constitution, and the act of April 18, 1874, P. L. 61; but the holders of 33,303 shares were present, in person or by proxy, the entire capital stock consisting of 38,888 shares. The mortgage was made to cover the franchises, as well as the railroad and other property of the corporation.

By the act of April 3, 1837, P. L. 185, incorporating the Pittsburgh & Connellsville Railroad Company, power was conferred upon it to "purchase, receive, have, hold and enjoy . . . lands, tenements and hereditaments, goods, chattels, and all estate, real, personal and mixed, of what kind or quality soever, and the same from time to time to sell, mortgage, grant, alien or dispose of," etc. By § 5, act of April 18, 1853, P. L. 566, said company was authorized "to mortgage or otherwise encumber their said road, and any real or personal estate which may belong to it, for the purpose of carrying out the privileges granted by the act, and the several supplements thereto, incorporating the same." It was by § 6 of the act of 1853, that the company was authorized by this state to extend its railroad beyond Connellsville; and, by the act of April 6, 1854, P. L. 281, said company was empowered " to issue its bonds hereto-

fore authorized, bearing any rate of interest not exceeding seven per centum per annum, convertible at the will of the holder into stock of the company at par, or on such terms as may be agreed upon, and any sale of said bonds for a less amount than their par value shall not be construed to be a violation of the usury laws of this commonwealth."

. The plaintiffs' bill alleged that the transaction consummated by the issuing of the bonds and mortgage in question, was a fraudulent scheme, concocted for the benefit of the Baltimore & Ohio Railroad Company to enable it to raise money for its own purposes, and carried out to the prejudice of the other stockholders of Pittsburgh & Connellsville Railroad Company, by means of the domination and control which the former company had over the management of the affairs of the latter; that there was no necessity, on the part of the Pittsburgh & Connellsville Railroad Company, for the issue of said bonds, and that the Baltimore & Ohio Railroad Company compelled it to buy, at inflated prices, the rolling stock and corporate stocks and bonds above referred to, simply for the purpose of creating a seeming basis for the issue of the bonds now in question, whereas it had no need therefor at all.

Upon the question of fraud thus raised, the master presented in his report a very elaborate history of the Pittsburgh & Connellsville railroad; of the connection of the Baltimore & Ohio Railroad Company therewith, and of the relations between it and the connecting roads whose stocks and bonds formed part of the consideration of the mortgage; and, after reviewing fully the transaction in question, negatived the charges of fraud made by the plaintiffs, and found that the mortgage bonds involved in the controversy were given for a bona fide and fair consideration, and that the discount of ten per cent of the face thereof was a fair and proper one, their market value not exceeding the amount paid for them, in view of the fact that the mortgage securing them was a second mortgage, subject to one for £2,200,000 sterling, placed upon the railroad in 1876, and that the rate of interest borne by the bonds was five per cent. A part of the master's findings upon this subject is quoted in the opinion of the Supreme Court, infra. He found also that the bonds were in the hands of bona fide holders for value, whose rights could not be affected even if the plaintiffs'

Statement of Facts.

allegations respecting the character of the transaction were sustained. As to the delay of the plaintiffs in filing their bill, the master reported that they were not guilty of laches, for the reason that they had no actual knowledge of the transactions complained of until about sixty days before the bill was filed.

The master reported, further, that the provisions of § 7, article XVI. of the constitution, and of the act of April 18, 1874, P. L. 61, passed in pursuance thereof, regulating the manner in which corporations may increase their stock or indebtedness, had no application to the Pittsburgh & Connellsville Railroad Company, a corporation existing at the time of their enactment, citing: Lewis v. Jeffries, 86 Pa. 340; Hays v. Commonwealth, 82 Pa. 518; Ahl v. Rhoads, 84 Pa. 319; Williamsport Ry. Co.'s App., 120 Pa. 1; that in 1868, the company accepted the act of April 1, 1868, P. L. 547, empowering it to build branches from its main line, but it was unnecessary to determine whether such acceptance subjected it to the act of May 3, 1855, P. L. 423, and the constitutional amendment of 1857, so as to render its character subject to alteration or repeal, inasmuch as the act of April 18, 1874, P. L. 61, was not intended to alter existing charters; and that the facts and circumstances stated in McAboy's App., 107 Pa. 548, did not show that the company had accepted or received the benefit of any legislative grants since 1874, so as to become subject to the new constitution. The master held, accordingly, that the mortgage and bonds in question were valid, notwithstanding the provisions of the present constitution and the act of April 18, 1874, the company having been invested with power to give them by the acts of April 3, 1837, P. L. 185; April 18, 1853, P. L. 566; and April 6, 1854, P. L. 281; and recommended that the bill of the plaintiffs be dismissed at their costs.

Exceptions to the master's findings and recommendation having been overruled by the master and afterwards renewed before the court, on the filing of the report, after argument thereof the court on September 6, 1889, entered a decree, without opinion filed, dismissing the exceptions, confirming the master's report, and dismissing the plaintiffs' bill as recommended. Thereupon, the plaintiffs took this appeal, specifying, inter alia, that the court erred:

1. In not decreeing the mortgage and bonds in question to be void.

2. In decreeing the dismissal of the plaintiffs' bill.

4. In not decreeing to the plaintiffs the relief prayed for.

8–18. In overruling the plaintiffs' exceptions to the master's findings of fact.

*Mr. William S. Pier* and *Mr. D. T. Watson*, for the appellants:

1. A corporation has such powers only as have been expressly granted to it by the state, and such incidental ones as are necessary to make its express grants effectual: Commonwealth v. Bringhurst, 103 Pa. 137; Diligent Fire Co. v. Commonwealth, 75 Pa. 291; Wolf v. Goddard, 9 W. 550. Unless so authorized, a lease or mortgage of a railroad company's property and franchises is void: Thomas v. Railroad Co., 101 U. S. 71; Sandford v. Railroad Co., 24 Pa. 380; Pittsb. etc. R. Co. v. Allegheny Co., 63 Pa. 126. The incorporating act of April 3, 1837, P. L. 185, did not intend to authorize the Pittsburgh & Connellsville Railroad Company to make such a mortgage as the one here in question. The subject matter of the grant of power to acquire property, " and the same from time to time to sell, mortgage," etc., did not include both the franchises and railroad of the company. This construction is supported by the fact that the legislature by the act of April 18, 1853, P. L. 566, specially authorized the mortgaging of the railroad and other estate, for the purpose of carrying out the privileges granted by the incorporating act and its supplements.

2. The object of the act of 1853 was to provide means to build the railroad. That object having been attained in 1871, the power granted by the act of 1853 could no longer be exercised. Moreover, the act of April 6, 1854, P. L. 281, allows the sale by the company of its bonds, theretofore authorized, at less than par. We can find no previous act authorizing the issue of bonds, and the act of 1854 does not pretend to grant the right to make and issue bonds. Neither of the acts cited, nor all of them together, authorize the bonds and mortgage in controversy. If the company had any power to make and issue them, it must be at common law. A corporation, which is indebted, undoubtedly has a right to issue bonds evidencing

the debt: Williamsport v. Commonwealth, 84 Pa. 487; but, when bonds are issued to increase an indebtedness, statutory power must be shown: Packer v. Railroad Co., 19 Pa. 218; Penna. R. Co. v. Canal Commissioners, 21 Pa. 22. There is no common-law right in a railroad company to mortgage 'its franchises, and its property necessary to their exercise, and such a mortgage, if not expressly or impliedly authorized by the legislature, is void: Commonwealth v. Smith, 92 Mass. 448; Pierce v. Emery, 32 N. H. 508; Coe v. Railroad Co., 10 Ohio St. 372 (75 Am. Dec. 518).

3. These bonds are void, because issued in disregard of the provisions of § 7, article XVI. of the constitution and of the act of April 18, 1874, P. L. 61: Fowler v. Scully, 72 Pa. 456. The constitutional provision cited applies to this corporation. General laws enacted subsequent to its incorporation, are binding upon and enforceable against it, so long as they do not impair the obligation between the state and the corporation: Providence Sav. Inst., 9 Cush. 604; Newton v. Commissioners, 100 U. S. 557; Nelson v. Railroad Co., 26 Vt. 718 (62 Am. Dec. 614); Morawetz on Priv. Corp., § 1062, 1065, 1067; Hare's Am. Const. Law, 609. The master ruled that the constitution of 1874 is inapplicable to the Pittsburgh & Connellsville Railroad Company, citing Commonwealth v. Hays, 82 Pa. 518; Ahl v. Rhoads, 84 Pa. 319; Lewis v. Jeffries, 86 Pa. 345. But, he overlooked the firmly-established distinction between that class of cases and cases like Lewis v. Hollahan, 103 Pa. 425; Penna. R. Co. v. Duncan, 111 Pa. 353; Penna. R. Co. v. Bowers, 124 Pa. 185. The distinction is, that if the corporation had accepted legislation subsequent to the constitutional amendment of 1857, it is subject to the present constitution the same as if incorporated since 1874. The master has found that this company did accept legislation in 1868. Indeed, it has accepted legislation since 1874: McAboy's App., 107 Pa. 548.

4. While the Baltimore & Ohio Railroad Company was the owner of a controlling interest in the Pittsburgh & Connellsville Railroad Company, it was bound to manage and control the latter corporation in such way as should be for the interest and benefit of all the stockholders, and had no right to manage and control it, or to make use of its property, for selfish pur

Arguments.

poses, or to procure advantages which were hostile to the interests of the remaining or minority stockholders. In a word, the Baltimore & Ohio Railroad Company was a trustee in its management and control as the majority stockholder, was visited with all the obligations imposed by law upon trustees, and was bound to exercise the greatest good faith: Rice's App., 79 Pa. 204; Méeker v. Iron Co., 17 Fed. R. 48; Menier v. Telegraph Works, L. R. 9 Ch. App. 350; Erwin v. Ry. & Nav. Co., 27 Fed. R. 625; Barr v. Railroad Co., 96 N. Y. 444; Peabody v. Flint, 6 Allen 52; Cook on Stockholders, § 662; Morawetz on Corp., § 447. In Pullman Palace Car Co. v. Railway Co., 115 U. S. 587, and Porter v. Steel Co., 120 U. S. 649, cited by the master as modifying the doctrine of Rice's Appeal and Meeker v. Iron Works, supra, there was no question as to an abuse of trust. The testimony abundantly shows such abuse in the present case.*

*Mr. John S. Ferguson* and *Mr. Johns McCleave* (with them *Mr. George Shiras, Jr.*), for the appellees :

1. An ultra vires act of a corporation will not be set aside unless the money or property, received by the corporation from third persons by means thereof, is returned to such persons: Cook on Stockholders, § 698; Morrow v. Rees, 69 Pa. 373; Negley v. Lindsay, 67 Pa. 228; Beetem v. Burkholder, 69 Pa. 254; Pearsol v. Chapin, 44 Pa. 10; Beaufort v. Keokuk Co., 69 Mo. 698; Harpending v. Munson, 91 N. Y. 650; Gould v. Cayuga Bank, 86 N. Y. 75. Unless restricted by statute, a corporation has a clear right to issue bonds: Commonwealth v. Pittsburgh, 41 Pa. 284; Watts's App., 78 Pa. 370; Phila. etc. R. Co. v. Stitchter, 11 W. N. 325. The question of power, in this case, relates not to the bonds, but to the mortgage of the franchises given to secure them.

---

* The brief of appellants' counsel contained an elaborate review of the testimony, in support of the charge that the bonds and mortgage sought to be set aside, were procured by the Baltimore & Ohio Railroad Company in bad faith and without giving an adequate consideration therefor. As indicating the magnitude of the case, in its presentation to the court, it may here be stated that the testimony and exhibits presented to the master, covered 621 printed pages; the master's report 210 pages; the argument for the appellants 78 pages, and the argument for the appellees 72 pages.

The power to mortgage the franchises, exists by necessary implication from the express power to mortgage the railroad: Pollard v. Maddox, 28 Ala. 321; Cooley's Const. Lim., 64; United States v. Fisher, 2 Cranch 358; McCulloch v. Maryland, 4 Wheat. 428; New Orleans R. Co. v. Delamire, 114 U. S. 501; Memphis R. Co. v. Commissioners, 112 U. S. 609; Galveston R. Co. v. Cowdrey, 78 U. S. 439; East Boston R. Co. v. Railroad Co., 13 Allen 422; Bardstown R. Co. v. Metcalfe, 4 Met. (Ky.) 199 (81 Am. Dec. 541).

2. As to the policy on which the doctrine that legislative authority is requisite to a mortgage by a railroad company of its corporate franchises rests, see Shepley v. Railroad Co., 55 Me. 395; Kennebec R. Co. v. Railroad Co., 59 Me. 9; Miller v. Railroad Co., 36 Vt. 494; Branch v. Jesup, 106 U. S. 468. In Pennsylvania, such a policy has been completely abandoned, as is indicated by the legislation relative to corporate mortgages, to judicial sales of corporate franchises, and to the merger and consolidation of railroad corporations: Act of March 13, 1873, P. L. 45; act of April 7, 1870, P. L. 58; act of April 8, 1861, P. L. 259. But, even if the mortgage of the franchises were invalid, this would not affect the instrument as a mortgage of such property as the company had power to mortgage: Carpenter v. Mining Co., 65 N. Y. 443; Pullan v. Railroad Co., 4 Biss. 41; Butler v. Rahm, 46 Md. 541; Central Mining Co. v. Platt, 3 Daly 263. The plaintiffs, however, cannot raise the question; only the state can do so: Dunham v. Isett, 15 Iowa 294; McAlister v. Ward, 54 Miss. 106; Branch v. Jesup, 106 U. S. 468; Allegheny v. McClurkan, 14 Pa. 81; Farnham v. Canal Co., 61 Pa. 265; Grant v. Coal Co., 80 Pa. 208; Oil Creek etc. R. Co. v. Transp. Co., 83 Pa. 160.

3. The clause in § 7, article XVI. of the constitution, forbidding any increase of " the stock *and* indebtedness " of a corporation without the consent of the majority of the stockholders, given at a meeting held after sixty days' notice, refers to an increase of indebtedness predicated of an increase of stock. To read " and " as " or," would not only do violence to the language, but would place such difficulties in the way of the transaction of business on credit, as would stop the business of every corporation in the state. The design was to prevent expansion of debts beyond the limit allowed by the

charter, without the consent of the stockholders : Lewis v. Jeffries, 86 Pa. 345. But, suppose the constitution of 1874 applies to this case. The only result is, that the plaintiffs show an exercise of the power to increase indebtedness in an irregular manner, and such irregularity does not render the act void, especially as to bona fide holders of the bonds : O'Hare v. Bank, 77 Pa. 96 ; Ossipee Mfg. Co. v. Canney, 54 N. H. 295; Poole v. West Point Ass'n, 30 Fed. R. 513 ; San Antonio v. Mehaffy, 96 U. S. 312; Macon Co. v. Shores, 97 U. S. 272 ; Taylor on Corporations, §§ 127, 204, 205, 286, 329 ; Columbia N. Bank's App., 16 W. N. 357 ; Kerr v. Corry, 105 Pa. 282 ; Manhattan H. Co. v. Phalen, 128 Pa. 110 ; Chubb v. Upton, 95 U. S. 665; McHose v. Wheeler, 45 Pa. 32. The plaintiffs, suing as stockholders, stand on the right of the corporation, and cannot set up the plea of ultra vires : Columbia N. Bank's App., 16 W. N. 357 ; Oil Creek etc. R. Co. v. Transp. Co., 83 Pa. 166; Wright v. Pipe Line Co., 101 Pa. 204 ; Goundie v. Water Co., 7 Pa. 233 ; Grant v. Coal Co., 80 Pa. 208 ; National Bank v. Mathews, 98 U. S. 621; Pullman v. Upton, 96 U. S. 328.

4. The constitutional provision referred to, however, cannot govern the Pittsburgh & Connellsville Railroad Company: (a) Because the provisions of its charter, regulating the management of its affairs, constitute a contract which cannot thus be impaired : Dartmouth College Case, 4 Wheat. 652; Hays v. Commonwealth, 82 Pa. 518; 2 Morawetz on Corp., § 1047; Black on Const. Prohibitions, § 15 ; Commonwealth v. Transp. Co., 107 Pa. 112 ; (b) because the constitution was not intended to apply to previously existing corporations : Ahl v. Rhoads, 84 Pa. 319; Baker's App., 109 Pa. 471; Hays v. Commonwealth, 82 Pa. 518. That these cases are not overruled by Penna. R. Co. v. Duncan, 111 Pa. 353, was expressly held in Williamsport Ry. Co.'s App., 120 Pa. 1. The holders of the Baltimore & Ohio bonds, as security for which those here in question are pledged, are necessary parties to this bill : Harrisburg etc. R. Co.'s App., 22 W. N. 417 ; Board v. Railroad Co., 46 Tex. 316 ; Leavenworth R. Co. v. Douglas Co., 18 Kas. 169. Said bondholders and the Union Trust Company are bona fide holders for value of these bonds, and their rights as such bar the relief prayed for : Steamboat Co. v. McCutch-

Opinion of the Court.

eon, 13 Pa. 13; Taylor on Corp., §§ 204–207; Phelan v. Moss, 67 Pa. 59; Munn v. McDonald, 10 W. 270; Mason v. Frick, 105 Pa. 162; Gibson v. Lenhart, 101 Pa. 522; Kerr v. Corry, 105 Pa. 282; Jones on Railroad Securities, §§ 198, 207, 288, 290, 291.

OPINION, MR. JUSTICE GREEN:

It was contended for the appellants, on the argument of this case and in the paper-books, that there was no power expressly given to the Pittsburgh & Connellsville Railroad Company to mortgage its franchise; and the conclusion was deduced that, as the mortgage in controversy included the franchise as well as the railroad and specific property of the company, the entire mortgage was rendered void. We do not assent to the proposition that there was no authority expressed or implied to mortgage the franchise, but the decision of that question is not necessary, because we do not in any event agree, that if the mortgage is not operative as to the franchise, it is therefore not operative as to the railroad and specific property described therein and covered by its terms. If there was a lack of lawful power to mortgage the franchise, the only necessary result that would follow, would be that the franchise would not be bound by the mortgage, and could not be sold under judicial proceedings upon it. But it certainly would not follow that, if there was lawful power to mortgage the railroad and specific property described in the mortgage, the mortgage would be entirely avoided as to it. At this time there is no practical question other than the validity of the mortgage in controversy. No proceedings and no sale of either the property or franchises of the railroad company under the mortgage have taken place. No ownership of the franchise is claimed, except by the company itself, and that claim is not questioned by any party to this controversy. Upon this subject, the question raised upon these pleadings is abstract only. If the defendant corporation, the Pittsburgh & Connellsville Railroad Company, had lawful authority to mortgage the property described in that instrument other than the franchise, it was not deprived of that authority by the circumstance that the mortgage included some other property or right as to which the power did not exist. The material question, then, is, did the company

have the power to mortgage the property described in the instrument other than the franchise? If it did, the mortgage is not void for want of authority.

The charter of this company, granted in 1837, P. L. 185, confers a power to mortgage in these words: "The Pittsburgh and Connellsville Railroad Company, and by the same name the subscribers, shall have perpetual succession, and all the privileges, franchises and immunities incident to a corporation; may sue and be sued, implead and be impleaded, in all courts of record and elsewhere; may purchase, receive, have, hold, and enjoy, to them and to their successors and assigns, lands, tenements, and hereditaments, goods, chattels, and all estate, real, personal, and mixed, of what kind or quality soever, and the same from time to time to sell, mortgage, grant, alien, or dispose of," etc. The power to mortgage is given in the most explicit language, and embraces all the property which the company may acquire or hold, "real, personal, and mixed, of what kind or quality soever." It is difficult to conceive how there could be a larger or more comprehensive description of the kind of property upon which the power to mortgage could be exercised, than is contained in these words. They embrace every species of property known to the law, and the power itself is not subjected to any limitations, restrictions, or qualifications of any kind. No provision is made as to the manner in which the power should be exercised, and hence no particular formalities were required to be observed. An authentic act of execution by the proper officers of the company would seem, therefore, all that was necessary to a valid exercise of the power. We cannot assent to the contention that, in addition to the power to mortgage, there must also be expressed a specific authority to borrow money and issue bonds therefor. The manifest purpose of a mortgage is to secure loans of money, and the power to borrow money and to give the ordinary evidences of loans in the form of bonds, or other obligations to the same effect, is a necessary incident to the power to mortgage. But it is also a necessary incident to the right to build a railroad; and it is only essential to have the power to mortgage expressly granted, in order that it may be exercised for the purpose of securing indebtedness, whether arising from loans of money, or upon other considerations. Nothing to the contrary of this was de-

cided in the case of Pittsb. etc. R. Co. v. Allegheny Co., 63 Pa. 126.

Additional power to mortgage was granted to this company by the fifth section of the act of April 18, 1853, P. L. 566, in these words: "And the said railroad company are hereby authorized to mortgage or otherwise encumber their said road and any real and personal estate which may belong to it, for the purpose of carrying out the privileges granted by the act and the several supplements thereto incorporating the same." It was contended for the appellants that this power was limited to the purpose of carrying out the privileges granted by the incorporating and supplementary acts, and that those privileges were exhausted when the road as then built was finished. By the sixth section of the same act the company was authorized to extend their road to any point they may select in Somerset or Bedford counties, so as to form a connection with the Chambersburg & Allegheny Railroad, or any other railroad that may be constructed. Other powers of extension were granted by previous and subsequent legislation. The power to mortgage clearly included the railroad and all other real and personal estate of the company, without reference to the time of its acquisition, so long as the purpose was observed of carrying out the privileges of the company granted by the original act of incorporation, or any supplements thereto. So long as the acts done or supposed to be done are within the legalized powers of the company, whether before or subsequent to the passage of this act, the power to mortgage attaches. We cannot agree that it was restrained to the mere physical structure then completed. If a subsequent acquisition of rolling stock should become necessary, or the erection or lawful acquisition of branches, in addition to those already possessed, should take place, it cannot be doubted that the power to mortgage, conferred by this act, would be applicable. We are clearly of opinion that the statutes in question gave all the necessary power to mortgage the property of the company, and, therefore, that the mortgage we are considering cannot be adjudged void for lack of authority.

It was contended, however, that it was void for the reason that it was given for an increase of indebtedness, and that this could not be done, except in accordance with the provisions of the constitution of 1874, and the general law passed in the

same year to carry those provisions into effect. The particular point of non-compliance with the law, was the omission to give notice for sixty days, to the stockholders, of a meeting to be held for the purpose of deciding the question of the proposed increase. In point of fact, such a notice was not given, though the holders of stock to the amount of 33,303 shares, out of a possible 38,888 shares, attended at the meeting and voted in favor of the mortgage. In the view that we take of this case, the discussion of this and several other questions raised and argued at much length becomes unnecessary. We are of opinion that the constitution and act of 1874 are not applicable to this company, so far as this subject is concerned.

The seventh section of the sixteenth article of the constitution provides as follows: " No corporation shall issue stock or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void. The stock and indebtedness of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock, first obtained, at a meeting to be held after sixty days' notice given in pursuance of law." The act of April 18, 1874, P. L. 61, prescribes the method of proceeding in order to effect an increase of stock or indebtedness in conformity with the constitution.

We have seen that the right of the company to mortgage its property was complete, absolute, and without any conditions or limitations as to the manner of its exercise. There was nothing, either in its charter or its supplemental acts, or in any general legislation prior to the constitution of 1874, which imposed any restrictions or formalities upon it, in the exercise of its right to increase its indebtedness, or to make mortgages upon its property. Neither the act of 1855, nor the amendment of 1857, which gave power to the legislature to alter, revoke, or annul charters of incorporation when they were injurious to the citizens of the commonwealth, had any specific effect upon this particular chartered right of this company. It is true that, in 1868, the company accepted the benefit of an act passed in that year, authorizing it to build branches, and, having done so, it may be conceded that it became subject to the operation of the act of 1855 and the amendment of

1857.   This being so, the company was in the precise position of the Williamsport Passenger Railway Company, whose right to lay its tracks without the consent of the city of Williamsport was adjudged by this court in the case of Williamsport Ry. Co.'s App., 120 Pa. 1.   That company was chartered in 1863, by a special law which gave it the right to lay its tracks in the streets of Williamsport.   There was nothing in its charter which required it to obtain the consent of the municipal authorities.   In 1887, the company undertook to lay additional tracks on some of the streets not previously occupied for that purpose, and the city filed a bill to restrain it, on the ground that under the constitution of 1874 and act of 1878 the consent of the city was necessary to be obtained before the tracks could be laid.   The court below granted the injunction upon their understanding of the decisions of this court in the cases of Penna. R. Co. v. Duncan, 111 Pa. 352, and Phila. etc. R. Co. v. Patent, 17 W. N. 198.

The charter of the Williamsport Passenger Railway Company having been obtained in 1863, it was of course subject to the operation of the act of 1855 and the amendment of 1857. Precisely the same argument was made before us then, as is now made in this case, to wit, that the company, being subject to legislative control by force of the act of 1855 and the amendment of 1857, became thereby subject to the constitution of 1874, and the subsequent legislation to enforce it; and our decision in Penna. R. Co. v. Duncan was cited and pressed upon us as conclusive of the question and the case.   But we did not take that view, and reversed the court below unanimously, the present Chief Justice delivering the opinion.   We held then that the railway company's right was given to it affirmatively and expressly in its charter, and could not be taken from it, either by a legislature or a constitutional convention, except for the causes expressed in the act of 1855 or the amendment of 1857, to wit, that the charter had become injurious to the citizens of the commonwealth.   And we further held that the act of 1878 was not intended to enforce the amendment of 1857.   At the end of the opinion, we said: " Our conclusion is that the charter of the appellant is not affected by the constitution of 1874 or the act of 1878.   It follows that it was error to grant the injunction."   To show how entirely analo-

gous that case is to this, it is only necessary to place side by side the two constitutional provisions:

| Article 17, § 9. | Article 16, § 7. |
|---|---|
| " No street-passenger railway shall be constructed within the limits of any city, borough, or township, without the consent of its local authorities." | " The stock and indebtedness of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock, first obtained, at a meeting to be held after sixty days' notice given in pursuance of law." |

The charter of the railway company conferred the right to lay tracks on the streets of Williamsport, and simply failed to require the city's consent to be obtained. The charter of the Pittsburgh & Connellsville Railroad Company conferred the right to mortgage its property, and imposed no formalities or restrictions upon the exercise of the right. It did not require any consent of the stockholders to be given. In the railway case, the right conferred by the charter was the right to lay its tracks in the city without obtaining the city's consent. In the present case, the right conferred by the charter was the right of the company to mortgage its property without obtaining the consent of the stockholders. There is no difference between the two cases, except that a right to lay a railway track was given in one, and the right to mortgage property in the other. The principles that determined the one are exactly applicable to the other. A brief citation from the opinion of Mr. Justice PAXSON, in the railway case, will suffice for this:

" There is nothing in the company's charter which makes the consent of councils a prerequisite to the exercise of its corporate powers in the extension of its road. Hence we have the question clearly cut, whether its charter is affected by either the constitutional provision or the act of assembly referred to. If the charter of the company remains in full force as originally granted by the commonwealth, its right to extend its tracks as proposed, is too clear for argument. It has been said by this court on more than one occasion that the constitution of 1874 did not ipso facto repeal charters. This principle was expressly ruled in Hays v. Commonwealth, 82 Pa. 523, in a very clear opinion by our Brother GORDON, and the same thought was expressed by the same judge in Penna. R. Co. v. Duncan, 111 Pa. 352, where he said: ' We also agree that the

framers of the constitution of 1874, did not intend to violate the laws of the federal government, or to repeal the provisions of any charter granted by the legislature of Pennsylvania.' That this case was not intended to assert the doctrine that the constitution repealed existing charters, the extract I have given fully shows; nor was it intended to overrule Hays v. Commonwealth. It was urged, however, that appellant's charter post-dates the constitutional amendment of 1857, which provides that 'the legislature shall have the power to alter, revoke, or annul any charter of incorporation hereafter conferred by or under any special or general law, whenever in their opinion it may be injurious to the citizens of the commonwealth, in such manner, however, that no injustice shall be done to the corporators,' and that the appellant's charter is subject to this provision and to appropriate legislation to enforce it. I concede all this, but I do not understand that the act of 1878 was intended to enforce this amendment, or to repeal the charter of the appellant. The amendment of 1857 did not give an arbitrary power to the legislature to repeal charters at will. It only authorizes such repeal for cause. It can only be done where the charter is injurious to the citizens of the commonwealth, and such reason should appear in some way as the moving cause which induced the legislature to take such action. And, even where such cause appears, the charter must be revoked or annulled in such manner, and no other, ' that no injustice shall be done to the corporators.'" Our Brother PAXSON, proceeding further, quotes from the opinion of Mr. Justice GORDON in Hays v. Commonwealth, 82 Pa. 523, as follows : "As there is in this case no allegation of a breach of any condition under which the Pittsburgh & Castle Shannon Railroad Company accepted its charter, or that that charter is in any particular obnoxious to the welfare of the citizens of this commonwealth, it cannot be successfully urged that it may be revised or abrogated by any state authority whatever. But the constitutional convention claimed for itself no such power ; on the other hand, it has expressly set down in (§ 2 of the schedule) that all rights, actions, prosecutions and contracts shall continue as if the constitution had not been adopted. And by the second section of article XVI. it is manifest that the convention did not intend to subject any private corpora-

tion to any of the provisions of the constitution which might
in any degree change the charter thereof.   If otherwise, why
say : ' The general assembly shall not remit the forfeiture of
the charter of any corporation now existing, or alter or amend
the same, or pass any other general or special law for the bene-
fit of such corporation, except upon the condition that such
corporation shall thereafter hold its charter subject to the pro-
visions of this constitution.'   This section is so comprehensive
and clear that nothing is left for surmise or doubt.   Charters
of private corporations are left exactly as the new constitution
found them, and so they must remain until the companies hold-
ing them shall enter into a new contract with the state by ac-
cepting the benefit of some future legislation."

This decision was followed in the case of Ahl v. Rhoads, 84
Pa. 319, where the power of a bank to secure a debt by a mort-
gage upon its property, executed without the consent of its
stockholders, was impeached upon the authority of the same
seventh section of the sixteenth article of the constitution that
is invoked against the mortgage given in the present case.   The
charter of this bank was obtained in 1862, and was, of course,
subject to the act of 1855 and amendment of 1857.   Yet we
held that " the power of this bank to secure its debt to the
plaintiff, in the mode adopted here, has not been destroyed or
impaired by the constitutional provision and the legislation
under it which the defendants have invoked ; " and also that
" the corporate powers and privileges of this bank were created
and defined by the act of incorporation passed on the 11th of
April, 1862, and the general legislation *then* in force."

In Lewis v. Jeffries, 86 Pa. 340, a mortgage given by a bank
incorporated in 1871, to secure a loan, and without the consent
of the stockholders, was impeached, also, upon the ground that
the mortgage was void by the seventh section of the sixteenth
article of the constitution.   An injunction was granted by the
court below, restraining the holder of the mortgage from col-
lecting it, upon the express ground that the constitution of
1874 was applicable and avoided the mortgage.   It was argued
for the appellant that the constitution was not intended to
apply to corporations already in existence.   This court re-
versed the court below, holding that the injunction should be
dissolved.

Hays v. Commonwealth, 82 Pa. 523, was a quo warranto to inquire by what authority certain officers of a railroad company, who had been elected by means of cumulative voting, which is allowed by the constitution of 1874, held title to their office. The company was chartered in 1871 under the provisions of the act of April 4, 1868, P. L. 62, and a special act approved April 21, 1872. The court below sustained the title of the officers who were elected by the cumulative system. It was contended by learned counsel for the appellant, the same who now appears for the present appellant, that the new constitution was not retroactive and did not apply to corporations already in existence; that the second and tenth sections of article sixteen, and the second section of the schedule, were entirely inconsistent with the view that the constitution was intended to embrace corporations previously in existence; that the charter was a contract with the state, which could not be impaired; and that the amendment of 1857 had no application, because it was only authority to " revoke, alter, or annul " charters which were injurious to the citizens, and so as to do no injustice to the corporators. All of these propositions were accepted and adopted by this court in the opinion delivered by our Brother GORDON.

Thus, in the four cases cited, we have held that the constitution of 1874 was not applicable of itself to previously existing corporations, and that, too, although the charters in all of them were granted subsequently to the act of 1855 and the amendment of 1857. We followed them all in Baker's App., 109 Pa. 461, and went still further, holding that it was not within the power of the directors of a corporation to formally accept the provision of the fourth section of article XVI. providing for cumulative voting, so as to bind the stockholders. In every one of these cases the decisions of the court below were reversed, holding the new constitution to be applicable; and in the last our Brother STERRETT said, speaking of Hays v. Commonwealth: " For reasons given at length in that case, and which need not now be repeated, the authority thus conferred on the stockholders is a vested right, with which the constitution of 1874 was not intended to interfere, except in the manner therein provided."

In view of the provisions of the second section of the six-

teenth article, that " The general assembly shall not remit the
forfeiture of any corporation now existing, or alter or amend
the same, or pass any other general or special law for the bene-
fit of such corporation, except upon the condition that such
corporation shall thereafter hold its charter subject to the pro-
visions of this constitution ;" and of the second section of the
schedule, that " All laws in force in this commonwealth at the
time of the adoption of this constitution, not inconsistent there-
with, and all rights, actions, prosecutions, and contracts, shall
continue as if this constitution had not been adopted ; " and in
view of the repeated decisions of this court that neither the
constitution of 1874, nor the legislation to carry it into effect,
had any application to existing charters, it is our plain duty to
decide, as we now do, that the seventh section of the sixteenth
article is not applicable to the Pittsburgh & Connellsville Rail-
road Company, so as to affect its rights and privileges under
its charter ; and, further, that its acceptance of legislation in
the year 1868 brought it only within the operation of the act
of 1855 and the amendment of 1857, but had no effect to bring
it within the provisions of the constitution of 1874.

But the case of Penna. R. Co. v. Duncan, 111 Pa. 352, is
pressed upon our attention with much earnestness by the
learned counsel for the appellants, and it is claimed, with much
confidence, to control the present contention. That case was
an action to recover damages for an injury inflicted upon the
plaintiff by the construction of the defendant's road immedi-
ately along the plaintiff's property, but not taking any of it.
The new constitution, by the eighth section of the sixteenth
article, gave a remedy for injuring as well as for taking or
destroying private property. The injury was inflicted upon
the plaintiff in that case after the adoption of the constitution
of 1874, and the question was whether the company was liable.
Immunity was claimed for the company on the ground that it
was not liable for injuries without taking, by the law as it
stood before the adoption of the constitution of 1874, and
therefore could not be made liable by force of its terms. With-
out going into minute particulars of the controversy, it will be
perceived at once that it was a contest between a citizen who
had been injured by the action of the company in constructing
its road, and the corporation inflicting the injury with a full

Opinion of the Court.

knowledge of the state of the law as it existed at the time of the injury. The very wide difference between the question thus raised and the question at issue in this case becomes manifest upon the slightest consideration. The question there was as to the right of a citizen to recover damages for an injury without a taking, which right was given to him by the law in force at the time the injury was inflicted, from the party that caused it. The company claimed immunity, not by virtue of any chartered right, expressly given, to commit the injury without liability, but simply because, by the law as it was before the constitution was adopted, there was no such liability, and such liability could not be imposed upon it, even for its own subsequent act, without a violation of its rights under the law as it was. But its rights under the pre-existing law were altogether negative, and were in no sense the result of a legislative grant of power to inflict the injury without liability. There never was such a grant of power to the defendant company in the Duncan case, and hence there was no question involved of taking away one of the company's chartered rights. Its freedom from liability for a consequential injury was simply the result of the want of a remedy for the person injured. Our previous constitutions gave no remedy except for a taking; and this court was obliged to hold, and did hold repeatedly, though with much regret often expressed, that the law gave no remedy for a mere injury without a taking.

Occasionally it happened that a remedy was given for a consequential injury, either in the charter or in some supplement conferring additional privileges, and then the courts made haste to administer relief. This was the case in Monongahela Nav. Co. v. Coon, 6 Pa. 379, where, in a supplemental act granting certain new privileges to the company, the legislature reserved the right to alter, amend, or annul the charter, and afterwards passed a law in 1844 directing the company to make amends for any damages done or to be done to lands on the Monongahela river, or its branches, or tributary streams, by overflowing the same. Then a second action was brought for the recovery of the very damages which had been refused in the first action, and this court held there could be a recovery, because the company had accepted the benefits of the supplemental act of 1839; and, because of the reservation of the

right of legislative control in that act, we held the company was bound by the subsequent legislation giving the remedy. Upon this case of Coon, our Brother GORDON rested his opinion in the Duncan case, holding that the two cases were in the same category, and that the defendant in the Duncan case was subject to the act of 1855 and the amendment of 1857, and the convention or the legislature " had the power to subject the company's exercise of the right of eminent domain to the provision that it make just compensation, not only for the property which it might choose to take, in the strict sense of that word, but also for such as it may injure or destroy." No question arose in the case as to the taking away of an expressly vested charter right of the company, and in point of fact they had no such charter right upon the subject in controversy. They were simply held liable to make compensation for an injury which they voluntarily inflicted at a time when, by the organic law of the state, such an injury could not be inflicted without making compensation. Neither that question nor any analogous question arises upon the present record.

We hold, therefore, that the right of the Pittsburgh & Connellsville Railroad Company to execute the mortgage in question is not affected by the provisions of the constitution of 1874, or the legislation to enforce it.' It is almost needless to add that there was no acceptance of legislation subsequently to 1874 by the Pittsburgh & Connellsville Railroad Company. McAboy's App., 107 Pa. 548, makes no decision on that subject. The decisions of this court in Lewis v. Hollahan, 103 Pa. 425, and Penna. R. Co. v. Bowers, 124 Pa. 183, are not kindred to the Duncan case nor to this, and they do not raise any similar question.

The foregoing considerations dispose of the contentions respecting the lawful power of the Pittsburgh & Connellsville Railroad Company to execute the mortgage in question.

The bill of the plaintiffs contained a number of allegations of fraud in fact on the part of the company, and also on the part of the Baltimore & Ohio Railroad Company, acting in combination with them, in conceiving and carrying out the plans for the concoction and execution of a scheme to give the bonds and mortgage for ten million dollars for the exclusive benefit of the Baltimore & Ohio Railroad Company, a majority stock-

Opinion of the Court.

holder, and to the prejudice and injury of the Pittsburgh & Connellsville Railroad Company and the minority stockholders. Upon the hearing before the master an immense amount of testimony was given, upon which the master has made a most elaborate and exhaustive report. He has considered and reviewed all the allegations made by the plaintiffs, and the argument submitted in support of the plaintiffs' contentions respecting them, pursuing a most searching and extended investigation into them all. In conducting the work of his report he has furnished us with a minute and detailed history of the Pittsburgh & Connellsville Railroad Company, its origin, its construction, its extension, its business as it was from time to time, down to the date of the proceedings in this case; and also a similar history of all the branch roads which were purchased from the Baltimore & Ohio Company by the Pittsburgh & Connellsville Railroad Company, which purchase constituted a part of the transaction in question. After completing his very elaborate and highly valuable discussion and presentation of the testimony, he makes the following most important findings with respect to the whole of it:

"In concluding this extended and somewhat laborious review of the evidence in the case, the master is constrained to say that the case of the plaintiffs, as made in the pleadings, has few features in common with the case presented by the evidence. It seems to the master to be improbable that the plaintiffs knew when they filed their bill that there was a judgment in the Circuit Court of the United States against the Pittsburgh & Connellsville Railroad Company in favor of the Baltimore & Ohio Railroad Company for more than $4,000,000; that they had any knowledge of the sale by the latter company to the former of rolling stock equipment to the amount in value of more than $1,200,000; or that the plaintiffs had any real knowledge of the value to the Pittsburgh & Connellsville Railroad Company of the several branch lines purchased by that company of the Baltimore & Ohio Railroad Company, or of the circumstances under which they had been built or acquired, though all the evidence reviewed was fairly admissible under the pleadings. Be this as it may, the allegations of fraud which constitute the gravamen of the plaintiffs' bill have not been sustained by the evidence, either as respects the particular transactions averred,

or the conduct of the Baltimore & Ohio Railroad Company in its relations with the Pittsburgh & Connellsville Railroad Company in any matter or at any time. It has not been proved, nor is there a scintilla of evidence tending to prove, that the income of the Pittsburgh & Connellsville Railroad Company has ever been fraudulently or dishonestly diverted from the treasury of that company into that of the Baltimore & Ohio Railroad Company.

" There is no proof of collusion or fraudulent connivance by the directors or officers of the Pittsburgh & Connellsville Railroad Company with the Baltimore & Ohio Railroad Company, or its officers or agents, in the issue and making of the bonds and mortgage, called the second consolidated mortgage bonds of the former company, for $10,000,000, nor in the disposition of the proceeds of those bonds, nor of any weak subserviency or accommodating acquiescence in any plan or project of the Baltimore & Ohio Railroad Company leading up to that transaction; nor is there any evidence of fraud, dishonesty, or hard dealing on the part of the Baltimore & Ohio Railroad Company, its officers or agents, in any matter connected with this business, nor of any attempt to improperly influence the directors or stockholders of the Pittsburgh & Connellsville Railroad Company. The purposes for which the bonds were authorized and issued were lawful corporate purposes. The debt paid was an honest debt, and amounted to $4,688,282.67; the equipment purchased was necessary, and purchased at a fair price, which was $1,212,500. The branch roads thus acquired were indispensable to the Pittsburgh & Connellsville Railroad Company, and fairly worth what was paid for them, to wit, $2,803,239.63. The $10,000,000 of second consolidated mortgage bonds were taken at their full value by the Baltimore & Ohio Railroad Company, which was ninety per cent of the face or par value, and they were received in full payment of the aforementioned debt, and of the prices and sums of money for which the rolling stock equipment and the said stocks and bonds were sold to the Pittsburgh & Connellsville Railroad Company. It is also proven that the Baltimore & Ohio Railroad Company paid into the treasury of the Pittsburgh & Connellsville Railroad Company the sum of $295,977.90, the residue of the proceeds of the sale of the second consolidated mortgage bonds for

Opinion of the Court.

$10,000,000, which, with the amount paid on account of the debt, $4,688,282.67, of the purchase of the rolling stock equipment, $1,212,500, and of the purchase of the stocks and bonds of the branch roads, $2,803,239.63, aggregate the sum of $9,000,000, being ninety per cent of the par or face value of the bonds for $10,000,000.

"It is admitted that the Baltimore & Ohio Railroad Company has been the holder of a large majority of the shares of the stock of the Pittsburgh & Connellsville Railroad Company ever since the year 1870; but there is no evidence that it ever exercised its power, as such majority stockholder, to elect directors of the latter company in its own interest, and against the interests of the minority stockholders. There is no evidence that the Baltimore & Ohio Railroad Company influenced or attempted to influence the directors of the Pittsburgh & Connellsville Railroad Company in any matter or thing by which its own interests might be promoted at the expense of or to the injury of the minority stockholders; and certainly no evidence of such influence, or attempted influence, on the directors of said company in the matter of the making and issuing of the $10,000,000 consolidated mortgage bonds, nor in the purchase of the rolling stock equipment, nor in the purchase of the stocks and bonds of the branch lines aforesaid. But there is much evidence of large advances made by that company, and also of large expenditures by it, for the benefit of the Pittsburgh & Connellsville Railroad Company, in the advantages of which all the stockholders shared, according to their respective holdings. The evidence discloses nothing proving or tending to prove that the Baltimore & Ohio Railroad Company, as the majority stockholder, dictated the policy of the Pittsburgh & Connellsville Railroad Company, or operated the railroad of that company in its own interests, to the prejudice or against the interest of the minority stockholders."

If these findings are true, they absolutely destroy the plaintiffs' case. We have patiently and carefully read and examined the whole of the master's report, and the evidence upon which he makes his findings; and we have read and considered attentively the whole of the argument of the learned counsel for the appellants with reference to these findings, and we are obliged to say that, in our judgment, the master is fully and entirely sustained by the overwhelming weight of the testimony.

Opinion of the Court.

Much stress is laid upon the fact that the mortgage and bonds were desired for use, and were actually used, by the Baltimore & Ohio company in raising money for their own purposes; and the inference is drawn that this was an illegitimate use of the securities rendering void the whole transaction. We cannot agree to this view of the subject. If the Baltimore & Ohio company furnished a full and fair consideration for the bonds it received, and if, upon the whole facts of the case, the transaction was not injurious to the interests of the Pittsburgh & Connellsville company, the bonds were the lawful property of the Baltimore & Ohio company, subject to any use they might see fit to make of them; and whether the use to which they did put them was beneficial to that company was not a question of material circumstance in considering the validity of the transaction. Upon the question of the character and quality of the consideration furnished by the Baltimore & Ohio company the report of the master is most full and satisfactory. He finds that by means of this mortgage, the Pittsburgh & Connellsville Railroad Company paid off in full a debt of $4,688,282.67, which it honestly and fairly owed to the Baltimore & Ohio company, and for which the latter company had obtained a judgment against it in the Circuit Court of the United States, and which the Baltimore & Ohio company was perfectly at liberty to proceed to collect by legal process at any time. In addition to that, the Pittsburgh & Connellsville company received from the Baltimore & Ohio company rolling stock equipment, all of which is minutely described in the testimony and in the report, at a valuation of $1,212,500, when it was in reality worth a considerably larger sum. And the master further finds that it was of much more advantage to the Pittsburgh & Connellsville company to be the owner of this equipment than to be paying a large annual sum for the use of it, as it had been doing for a number of years. All the figures are given in the report and the testimony from which they are drawn, and they substantiate the finding beyond question. The master further finds that the bonds and stocks furnished by the Baltimore & Ohio company to the amount of $2,803,239.63 were the bonds and stocks of tributary roads, which were indispensable to the Pittsburgh & Connellsville company, and vital to the successful prosecution of its business.

Opinion of the Court.

The evidence upon this subject is very extended, and it is treated at great length in the report, where the reasons for the master's conclusions are set forth with an unanswerable force.   He shows that the price at which these securities were taken was a fair and moderate valuation, and that the company was greatly benefited by their acquisition.   The master fully justifies the discount of ten per cent at which the bonds of the Pittsburgh & Connellsville company were taken, by showing that they were secured by a second mortgage only, and with the rate of interest at five per cent.   The testimony of witnesses proves conclusively that such a bond could not be floated at so high a percentage as ninety on the market. Upon all these findings the sustaining testimony is ample, and most of it entirely uncontradicted.   It is quite unnecessary to review it in detail in this opinion.   We are entirely satisfied with the correctness of the master's findings upon all these matters.

It thus appears that the Pittsburgh & Connellsville Railroad Company was able to pay, and did pay, by means of the mortgage and bonds in question, an immense overdue debt of more than four millions of dollars, and acquired title to an indispensable equipment, and to the stocks and bonds of several tributary roads essential to its success.   It paid no money; it gave only promises to pay money at the end of forty years.   How any minority stockholders could suffer by such an arrangement it is impossible to discover.   That the Pittsburgh & Connellsville company was greatly benefited by it cannot be doubted. From its very infancy the besetting trouble of this company was its want of money and credit.   On this account it was unable to build its original road.   It was subsequently unable to pay for its necessary repair.   It was unable to build its extension to Cumberland; and it was utterly unable to build or purchase any of the feeders whose traffic was absolutely essential to its success.   In all these emergencies, it was helped from the beginning, with money and equipment and in the construction of the feeders, by the Baltimore & Ohio Railroad Company.   True, it was to the interest of that company to sustain and assist this one, but that circumstance does not belittle in any degree the value and great advantage of the assistance thus given.   It has kept the Pittsburgh & Connells-

ville company alive, and constantly increasing in business and
capacity, until it is now a firmly-established and self-sustaining
company of great and growing importance in the railroad
world.   In view of these considerations, we do not think it
requisite to engage in a minute or protracted discussion as to
the law in relation to the duties of majority stockholders and
the rights of minority stockholders.  When the latter have
received no injury, but, on the contrary, benefits, by the trans-
action called in question, they have no just cause of complaint,
even though the majority stockholders are also benefited.   Such
has been the finding of the master, in this case, and it has been
confirmed by the learned court below.   The conclusions there
reached appear to us to be fully sustained by the testimony,
and they meet with our approval.

> The decree of the court below is affirmed, and
> the appeal dismissed at the costs of the ap-
> pellant.

Mr. Justice STERRETT noted his dissent.

Mr. Justice WILLIAMS : I concur in this judgment, because
I think the findings of fact made by the master and approved
by the court below fully justify it.   The further reasons, given
in the opinion of the court just filed, I have not considered,
and am not now able intelligently to assent to or dissent from
them.   For this reason I prefer to state the ground of my con-
currence.

Mr. Justice McCOLLUM: I concur in the judgment, for the
reasons above stated.